I guess we don't have hard lines anymore to get a deposit on. Huh? Who knew? The third case in our docket this morning is 23-50465 Belknap v. Spinks. Mr. Iglesias. Thank you, Chief Judge Richmond, and may it please the court. My name is David Iglesias, and I represent Leon County Jailers Tisha Spinks and Harry Vanskyke. In Waller v. Terry County, an inmate informed booking officers that he was schizophrenic and depressed. He threatened to commit suicide during an arraignment hearing, and he later attempted to kill himself in his cell by swallowing a razor blade, a sharpened pencil, and 40 prescription pills that he had hoarded. The inmate was evaluated by a mental health professional from a local MHMR facility who told jailers that he didn't need to be on suicide watch. The jailers relied on the MHMR professional's statement, removed the inmate from suicide watch, and he later killed himself a few days later. A district court in this circuit held that the jailers were entitled to qualified immunity because in light of the MHMR professional's statement, they did not subjectively believe or infer that the inmate might kill himself. In Cope v. Cogdill, an inmate told booking officers that he had attempted suicide immediately before his arrest and that he wished he had a way to commit suicide at that moment. Throughout the course of his incarceration, jailers actually observed the inmate attempt to commit suicide, and later a jailer stood in the hallway while he observed the inmate actually commit suicide, but he didn't intervene. Nonetheless, this court held that those jailers were entitled to qualified immunity. And in Edmondson v. Borrego, a man who was very clearly mentally ill was brought into a county jail where booking officers simply didn't assess him for his potential for self-harm. Despite suffering from delusions and clearly being mentally ill, the inmate was not placed on suicide watch and he was given bedding and clothing, which he later used to hang himself in his cell. This court held that the jailers were entitled to qualified immunity because they did not have the requisite subjective knowledge to infer that the inmate might kill himself. Your Honor, the high standard employed by the courts in these cases is correct because, as this court held in Domino, suicide is inherently difficult for anyone to predict, particularly in a depressing prison setting. You're basically saying no matter what you're told, since suicide is inherently hard to predict, there is no liability. No, Your Honor. No, Your Honor. This court has held that jailers can be held liable, first, if they were aware of a substantial and significant risk that the detainee might kill himself, second, that that jailer actually subjectively inferred that the detainee might kill himself, and third, that the jailer consciously chose to simply do nothing.  And under that standard, a jailer can be held liable, but that's not the case that we have here, Chief Judge Richman. Your Honor, these cases that I just cited were the clearly established law on December 14, 2020, when Dakota Belknap was booked into the Leon County Jail. When he was booked into the jail, Mr. Belknap told his booking officers that he outright denied any idea of suicide. He outright denied wanting to kill himself. Forty minutes after he arrived in the jail, Mr. Belknap underwent an examination by a certified mental health professional who worked for a local MHMR facility, and that certified mental health professional told jailers that Mr. Belknap does not appear to be a threat of harm to himself or others at this time. She also ranked him as a one on a zero to three scale of potential for self-harm. In light of the clearly established law at the time, the district court erred in denying the jailer's motion to dismiss. Jailer Spinks and Van Skyke could not have known in the blink of an eye that their housing of Mr. Belknap or that their actions taken after discovering him hanging in his cell might have violated his constitutional rights. First, I'll begin by addressing the appellee's failure to state a claim against the jailers for violating Mr. Belknap's constitutional rights with respect to his housing. It goes without saying that deliberate indifference is an extremely high standard to meet. In Edmiston, this court held that an official will not be held liable if he merely should have known of a risk that an inmate might kill himself. Cope states that a due process violation can never be based on a jail official's negligent failure to provide protection from harm. These holdings take on a special meaning in the context of jail suicide because as this court held in Domino, it's inherently difficult to predict, especially in a jail setting which is depressing. And that's why the court has developed the subjective deliberate indifference standard, the three elements of which I discussed a moment ago. In this case, the jailers are entitled to qualified immunity because the appellee's own allegations in their complaint specifically disprove each element of subjective deliberate indifference. First, the jailers weren't aware of any facts from which they could have inferred that there was a significant and a substantial risk that Mr. Belknap might end his life in the jail. As mentioned before, Mr. Belknap outright denied to the booking officers wanting to commit suicide. He also was examined by a certified mental health professional 40 minutes after he arrived at the jail, and that certified mental health professional told jailers that he did not appear to be a threat of harm to himself or others at this time. But even if the court were to countenance the appellee's argument that the mental health professional's evaluation of Mr. Belknap on a scale, as a one on a zero to three scale of potential self-harm, somehow should have notified the jailers that Mr. Belknap might harm himself, it can't be said that this low ranking on this scale informed the jailers that the risk was significant. But he was on suicide watch, even though MHMR said that, right? He was on suicide watch when he first came in because he told the jailers that he was depressed. So they put him on suicide watch. Forty minutes later, the MHMR professional came in and did a 20-minute evaluation of him and then told the jailers that he was not— But they didn't take him off suicide watch then. I believe that they did take him off suicide watch then, if I recall. But nonetheless, they were in complete reliance on this MHMR professional's affirmative statement to them that he was not, and that's a direct quote, he was not a harm to himself or others at this time. But considering the ranking of Mr. Belknap as a one on the zero to three scale of potential self-harm, the jailers could not have inferred that there was a significant or substantial risk that he might have harmed himself as required by COPE. But even if Mr. Belknap's constitutional rights had been violated, the jailers would still be entitled to qualified immunity because the clearly established law didn't put them on notice that their housing of Mr. Belknap might have violated his constitutional rights. As mentioned before, in COPE, an inmate actually told the jailers that he was suicidal. He was taken off suicide watch and later actually committed suicide while a jailer was looking on. Those jailers were entitled to qualified immunity. In the Waller case that I mentioned earlier, the district court in this circuit went even further. There, the district court afforded qualified immunity to jailers who removed a man from suicide watch in reliance on an MHMR professional's statement that he no longer needed to be on suicide watch, even though they knew that the man had swallowed a razor blade and swallowed 40 prescription pills that he had hoarded and swallowed a sharpened pencil. Now, this was the law that was clearly established when Jailers Spinks and Van Skyke had their encounter with Dakota Belknap. Second, the appellees argue that the jailers were deliberately indifferent to Mr. Belknap's serious medical needs when they did not administer CPR to him, even though they believed subjectively that he had died. The appellees' own allegations, again, in their complaint disprove their deliberate indifference claim. Specifically, the appellees allege that Jailers Spinks and a trustee discovered Mr. Belknap hanging in his cell approximately 14 minutes after his last face-to-face encounter with a Leon County jail staff. Jailers Spinks summoned Mr. Van Skyke when she found him hanging. Mr. Van Skyke and Jailers Spinks removed Mr. Belknap from where he was hanging. They laid him on the floor. They untied the ligature from around his neck, and Mr. Van Skyke checked for a pulse, but he didn't find one. He immediately ordered that the cell door be closed and locked and that the cell be sealed in anticipation of a Texas Rangers investigation, which only occurs whenever a person dies in a jail. When a co-worker, a few moments later, questioned Mr. Van Skyke about what happened, Mr. Van Skyke told that co-worker, yeah, he's gone. In short, the Jailers clearly and unequivocally believed that Mr. Belknap was successful in his suicide attempt. Because the Jailers believed that Mr. Belknap was already dead, it is legally and factually impossible for them to have been deliberately indifferent to his serious medical needs. Ms. Spinks and Mr. Van Skyke believed that Mr. Belknap had died, and he therefore had no more medical needs, serious or otherwise. So the appellee's claims for deliberate indifference for serious medical needs must fail. But even if the Jailers had not believed that Mr. Belknap had passed away, even if they believed that he was still alive, the appellee's claims would still fail because Ms. Spinks immediately upon finding Mr. Belknap hanging in his cell called EMS. And within 15 minutes, according to the allegations in the appellee's own complaint, within 15 minutes, both EMTs and one Leon County deputy were in Mr. Belknap's cell performing CPR on him. Your Honor, even though the Jailers subjectively believed that Mr. Belknap had passed away, they certainly did not ignore any medical needs that he might have had. We're talking about pleadings here. Yes, we're talking about pleadings, but this isn't the pleadings, Your Honor. This is what they've actually alleged, that she summoned an ambulance. And so, Your Honors, also the Jailers didn't violate any clearly established rights because this Court has specifically held in Cope, in footnote 8 of Cope, that a Jailer's failure to resuscitate an inmate who was recently found hanging in a cell does not rise to the level of deliberate indifference and therefore cannot be a violation of clearly established law. Also, Gonzales v. Bexar County, Mattis v. Joseph, and Hyatt v. Callahan County are all district court cases within this circuit that specifically hold that failure to administer a CPR to an inmate is negligence. It's not deliberate indifference. In other words, Mr. Belknap didn't have a clearly established right on December 15, 2020 to have CPR immediately administered to him. But nonetheless, Ms. Spinks called an ambulance immediately and CPR was being administered to him within 15 minutes after he was found in the cell. And although the district court recognized that the Fifth Circuit has absolutely no precedent which would require an inmate to be administered CPR immediately, the district court held that the Jailers would have been on notice of a right to have immediate CPR by citing two obscure cases from district and circuits far outside of the Fifth Circuit. This was error. As this court held in the estate of Bonilla v. Orange County, the robust consensus of cases that's necessary to find that a law is clearly established must be taken from within this circuit. And because there is no robust consensus of cases within this circuit, then the appellee's claims fail. In their brief, the appellees argued that nearly any person would know that Mr. Belknap's best chance at survival, even if he had no pulse, would be to perform CPR until EMS arrived. This is negligence, pure and simple. And this is not the extremely high standard of deliberate indifference which this court requires to hold Jailers liable in jail suicide situations. In conclusion, Your Honors, Mr. Belknap's suicide was inarguably tragic. But this court has held time again that the negligence standard and the benefit of hindsight have no place in the qualified immunity analysis. The appellee's allegations are based on nothing else. Again, we're just at the complaint stage, right? We are. And their complaint is quite different from what you're telling us. Well, Your Honor, I disagree. I think that when we view the timeline, when we view the actual allegations that the plaintiffs are making, their argument is that the Jailer should have known. They don't argue that there was this inference that is required. They don't allege that there was this inference required. And their allegations are that they simply should have known. Essentially, they're alleging negligence. I was referring to the actual suicide watch. You've got time for rebuttal. Oh, yes, ma'am. Thank you. Appellees, the Court. Bruce Thomas on behalf of the family and estate of Dakota Belknap, the plaintiff, and appellees in this case. Defendants are trying to present an alternative narrative. And they're trying to inject their defensive theories into a motion to dismiss. We are at the pleading stage. And they are presenting allegations that we don't make in our pleading and trying to make inferences from those new allegations. The Waller case, they cite, is a motion for summary judgment case. The Cope case is a motion for summary judgment case. Edmundston is a motion to dismiss. But in that case, the plaintiff, the deceased, was never on suicide watch. It was a different issue. If this were a summary judgment case, they could try to present alternative theories to try to explain away their actions. But on a motion to dismiss, they're stuck with our allegations, and they're not sticking with our allegations. They're attempting to insert new theories. We present two very straightforward issues that the magistrate judge's report will address, in this case, with respect to these two defendants. First, whether Dakota Belknap should have ever been put in a cell with obvious ligatures on the second day of his detention where he committed suicide. And second, should the jailers who found him nonresponsive hanging in the cell that day have immediately commenced CPR and resuscitation efforts while they were waiting for EMS to arrive so that he wouldn't suffer irreparable brain injury during that intervening time? The answer to the first question is clearly no. He should have never been in that cell with obvious ligatures because they knew he was a suicide risk. And the answer to the second question is obviously yes. As soon as they discovered him, they should have commenced resuscitation efforts because they knew that he would be suffering from irreparable brain damage by the time EMS would get there if they didn't. So let me address those two issues that we actually assert in that order. Defendants want to ignore the timeline here. The counsel talked about the timeline, but they're ignoring it and trying to inject this theory that everything changed with Amanda Despain's report. They say their theory now is that he was on suicide watch, but Amanda Despain came in, she made this report with the ones, and that changed everything. They took him off suicide watch, and that was some sort of release from his suicide watch. But that's not what we plead. We plead that Amanda Despain's report was confirmatory that he needed to be put on suicide watch, and they didn't follow her recommendation that he be reviewed the next day by another caseworker. And their theory is completely countered to the facts that we plead in the chronology. Amanda Despain's report was conducted in the first hour. It was conducted in connection with intake. They spent the first half hour doing their suicide screening and other forms, and then immediately, because she happened to be there, had her do her assessment during the second half hour of that first hour. And what did they do after she conducted her assessment and she provided them with a report? Well, they put him on suicide watch. They didn't take him off suicide watch. They put him on suicide watch. They put him in a cell. They commenced suicide watch, watching him every 15 to 30 minutes. Depending upon who you ask, they issued a suicide smock to him after they had her report, and they issued a suicide prevention blanket and kept him on suicide watch. So their alternative theory completely ignores the time frame. It just couldn't have happened that way. If it had the causative impact that they're trying to ascribe to it now, they never would have put him on suicide watch to begin with. But their actions confirm exactly what we're saying, that her report was confirmatory of a suicide risk. Sure, she could have rated him higher than a 1 on a 0 to 3 scale, but she still rated him as a suicide risk, and that combined with the answers to the screening questionnaire that he had recently commenced suicide, and that was attempted suicide according to what he reported, and that was the thing that put him on suicide watch, along with his report that he had untreated depression that he wished to have treated and his PTSD symptoms of nightmares and flashbacks. All that made him an obvious suicide risk, and with Amanda Despain's report in hand, they put him on suicide watch. So it is not correct that they took him off suicide watch. That's not what we plead, that they took him off suicide watch when they got Amanda Despain's report. It was just the opposite. Nothing changed with the go-to-bell naps condition. We allege no intervening facts that would have changed his condition between the time they put him on suicide watch and the time that the jailer, Spinks, decides to transfer him to a different cell the next day. When she goes to Van Skyke, apparently recognizing that this is a decision of some import, and, in fact, it's a life-and-death decision to go to bell nap, whether he is transferred to a cell with obvious ligature, she doesn't say anything in what she tells the Texas Ranger. She doesn't say anything that has anything to do with Amanda Despain's report. We don't know exactly why she wants to transfer him. Presumably she wants the cell, the holding cell that he's been in. She finds it inconvenient that he's in there, and she wants to transfer him to another cell. And her supervisor just completely abdicates responsibility. I don't care. I don't care. You make a decision. I don't care. Well, the Constitution says he can't not care. He's the jail sergeant. He knows he has a suicide risk in his charge, and he has a constitutional duty to provide suicide protection to that detainee, saying, I don't care is just the same as saying, I'm indifferent. Do whatever you want. He has to care because if he doesn't care, it evokes consequences, because it's a liberal indifference to put a suicidal detainee in a cell with an obvious ligature, as they did where he had access to bedding. So we never plead that Van Skuyck and Spinks changed the cell and took him off suicide watch because of the Spain's evaluation. That is very much contrary to what we actually plead. Turning to the, well, I would say this is a perfect example of why you don't take one evaluation at one point in time. What Amanda de Spain actually said in her report is the client does not appear to be a risk to himself at this time. And she explained to the ranger that that is limited to a single point in time and that the jailers would have understood that that was limited to a single point in time because it's a volatile crisis situation that can change on a dime, and he needs to be evaluated the next day. And they ignore that part that she says he needs to be evaluated on the next day. They simply arbitrarily put him in a different cell for undisclosed reasons. Counsel, he was evaluated the next day, just not by MHMR? I'm sorry. I thought he was evaluated the next day. He was evaluated by the nurse. Is that wrong? He was not evaluated the next day by the nurse according to them. I'm sorry. I'm reading it. He was not evaluated the next day by MHMR. He was not. So the day of his suicide, he was or was not evaluated by the nurse of the facility? He was not according to what the nurse told the ranger. He was supposed to be before he was. According to several witnesses that were interviewed by the ranger, it was the jail nurse that had that authority, and what we allege is the jail nurse should have ensured that he stayed on suicide watch. But she says she wasn't there, and she didn't do that. She says also she indicates that he should have stayed on suicide watch. During our interview with the Texas ranger, that Amanda Despain's report was not a report that indicated he should be removed from suicide watch. What happened, and maybe you're recalling this, is a judge came out and interviewed him that morning. I presume it was a probate mental health judge. After that evaluation, they had Amanda Despain's report in hand and offered it to the judge, and she said she didn't need it. It was not causative of anything occurring after that. It was just the normal course of events is there would have been MHMR evaluation the second day. Amanda Despain identified the person that was to make that interview the next day, but the jail did not ensure that that happened, and that's one of the complaints we make against the jail in our Mon-El allegations, that the jail had no policy to ensure that that second interview is what really should have been a series of daily interviews ever occurred. So can you refresh my recollection? The suicide, the tragic death, was on the 15th of December? I'd have to look at a blank slate of dates. He was detained on Monday. The 14th? Okay. He was detained on the 14th on Monday, and the suicide occurred during the afternoon, late afternoon of the 15th. And that's why I was asking this question, because I'm looking at paragraph 70 on page 42 of the Record on Appeal, and you allege, upon information and belief, Nurse Page conducted a medical and mental evaluation on Tuesday, December 15th, 2020. Yes, yes. As to her, we allege that. She denies it. Right, but I just asked you a second ago if Nurse Page had interviewed Mr. Belknap, and I thought you said no. I said she told the Texas Ranger no. She told the Texas Ranger no. We think she did. It's a disputed issue. What I also say is we say that she should have ensured that he stayed on suicide watch, and she did not. She says she wasn't there. But we're bound by the complaint, right? You're bound by the complaint and the complaint. You're bound by the most favorable reading of the complaint, and the complaint has a number of disputed issues through it that we report what they told the Texas Rangers, and then we opine based upon our reasonable inferences what's true and what's not true. So I'm trying to give you the most favorable reading of this possible. I really am. I'm just trying to understand. A lot of what's in the complaint is obviously based on interviews, recordings, et cetera, and so what I'm trying to figure out is the intersection between what you think from the recordings versus what we're bound by on the complaint. So if the complaint says Nurse Page interviewed Mr. Belknap on the day of the suicide, we would be bound by the fact that there was an interview, right? Unless you're saying that's not a well-pleaded fact and we should ignore it. No. We are making the allegation that she did, in fact, despite what she told the Texas Rangers, she did, in fact, interview. And what do you think she said at the end of the interview? We don't know. We don't know. What we know is that nothing had changed. And what we know is that she told the Texas Rangers that based upon what she claimed to know at that time, that he shouldn't have been taken off suicide watch. So what she should have been saying was he should not have been taken off suicide watch. So I guess the answer to your question, I'm saying that she would have said, she should have said, don't take him off suicide watch. She may not have said anything. So if I'm understanding the complaint, under your rendition of the facts, before the suicide, which, again, was horrible, there were three separate interviews. There was the MHMR interview on the 14th. There was the Nurse Page interview on the 15th. And then there was this magistrate judge that you referenced a minute ago. I'm not sure I followed what you were saying. A judge came to visit him during the morning of the 15th. So there were two on the 15th and one on the 14th. Actually, Nurse Page did some sort of quick interview with him on the 14th as well. Okay, so there were four interviews. That she admitted to before. She said she didn't have Amanda Despain's report at that point. And so what would be the best case that would say, would find deliberate indifference to a suicide in this circumstance, where you have four different mental health interviews prior to the suicide? Well, there are different types of interviews. But the best case is they all show that he's a potential suicide risk. The best case is nothing has changed between his intake, where he's attempted suicide three days earlier, still has the wounds from that, and still has the PTSD from a previous day, and should be on a course of continual interviews from MHMR. Apparently the judge is out there to see whether he needs to be committed to a mental institution. I'm terribly sorry. It was an artfully asked question. When I say best case, what I mean, I'm thinking of qualified immunity, and we have to find a case that would clearly establish the 8th Amendment contours. Jacobs. This is Jacobs all over again. How many mental health professionals were in Jacobs? There were no. I don't think there were any mental health professionals in Jacobs, but what there was was putting a person at risk of suicide. There are no mental health professionals here that are saying he's not at risk of suicide. Nothing changes between his intake. Where they put him on suicide, watch. And when they put him in the cell with the obvious ligature. So the deliberate indifference is from Jacobs putting a suicidal detainee in a cell with an obvious ligature when you know he's at substantial risk for suicide. That's my response. Turning to the second issue. Should they have immediately commenced CPR and life-saving measures when they found him. We do not allege that the reason they didn't was because they considered him to be dead and unrecoverable. What we allege is that they didn't do it because they never do it. Because since they've been dealing with Southern Health Partners and advocated all their health care responsibility to Southern Health Partners, that's all they do. If they have a medical issue, they call Southern Health Partners. And if the nurse is there, she deals with it. Unfortunately, most of the time, the nurse isn't there. So their backup is to call EMS. So the custom has developed that all they do is just call EMS and then take a hands-off to a health care issue. And that puts detainees at risk. Detainees at risk that have immediate crisis situations that must be addressed immediately to save their life because EMS, we know, is over 20 minutes away. 23 minutes is what the Texas Ranger put on it. Now, the magistrate judge here, in a very detailed opinion, identified in two pages a robust consensus of persuasive authority. Robust consensus of persuasive authority is always outside the circuit. There is no case law that says it's robust from inside.  And that robust consensus conclusion of law is not challenged by the defendants and their objections to the magistrate report. They simply challenge whether you can conduct such a review of authorities. So the objection isn't preserved, but even if it is, I don't think you necessarily even have to go to the robust consensus. I think it logically follows from the cases that we already have, that if you have, it puts beyond doubt that if it is deliberate indifference not to provide care when it is a non-emergency, then it has to be deliberate indifference when it is an immediate life-threatening emergency. And that's the sort of situation that the Austin-Thomas Court dealt with and why we cite it. We don't cite it for establishing new, clearly established law. We cite it for applying what already was clearly established by 2019 and 2020 at the time of these events, that it's always unconstitutional and deliberately indifferent to ignore a detainee's condition and not to provide medical care. And it doesn't matter if it's an emergency condition or a non-emergency condition. It's always, it's just more important in an emergency condition. I see my time is up. Thank you. Your Honor, my friend Mr. Thomas discussed the robust consensus of authority that the district court cited, that the magistrate judge cited in the report and recommendations. This consensus of authority includes district court cases from the District of Rhode Island, from Missouri, from Pennsylvania, from the Sixth and Eighth Circuits. Your Honor, it is beyond what is intended by clearly established law to expect a jailer in Centerville, Texas, to have working knowledge of a district court case in the District of Rhode Island, and within the blink of an eye, understand that because the District of Rhode Island said one thing, what they're doing in the Leon County Jail in Centerville, Texas, is unconstitutional. It goes beyond what is meant by clearly established. Your Honor, also, Mr. Thomas said that the best case for his proposition is Jacobs. And Jacobs versus West Feliciana Parish is very distinguishable from the case that we have before us today. Your Honor, in Jacobs, a woman put, during her arrest, a woman put a gun in her mouth, pulled the trigger, but it misfired. The jailer and the deputy were subjectively aware, there was no question, they knew that this had happened. It was uncontested that the sheriff in Jacobs and the deputy had inferred that there was a significant, serious risk that this woman would commit suicide. Nonetheless, they put her in a cell with a blind spot in it. They knew that this cell had tie-off points, and they knew that a man had committed suicide in that particular cell, on those particular tie-off points, I believe it was a few months before. And then they gave this woman, knowing, having subjectively inferred that she was a danger to herself, they gave this woman bedding, which she eventually used to tie onto this point and commit suicide. In this case, Mr. Belknap denied wanting to commit suicide to the booking officer. MHMR told the jailers that he was not a risk of harm to himself or others. What did she hang herself on? The complaint alleges that she was given a suicide blanket. What did she hang herself on? We're talking about Jacobs or Belknap? I believe that Mr. Belknap. Himself. Oh, no, it's okay. Mr. Belknap used a bunk bed, I believe. What? I think that it was a bedding, as I recall, a sheet. They didn't take the bedding away from him, even though he was on suicide watch? Well, I believe that Mr. Belknap had been removed in reliance on the MHMR. He'd been removed from suicide watch. But Jacobs is different than this case. Your Honor, also, the facts that the appellees allege in their complaint are that Mr. Belknap was evaluated by a certified mental health professional within 40 minutes of the time that he was brought into the jail. And the certified mental health professional told these jailers that he was not a risk of harm to himself. I thought they alleged she was not a certified mental health professional, that she was a civilian, didn't have any training. They say that in their responsive brief, yes, but in the complaint itself. I don't say that in the complaint. In the complaint itself, they allege that she had a bachelor's degree in psychology, she had a certification. They equivocate about what the certification means, but they allege that she had a certification in mental health as well. Your Honor, footnote 8 to Cope v. Cogdill eviscerates the appellee's claim for deliberate indifference to serious medical needs. In that footnote, this court held that in addition to waiting to enter the cell until Brixley arrived, laws also did not try to revive the inmate while waiting for emergency personnel. But a due process claim can never be based on a jail official's negligent failure to provide medical care. Because negligence does not support a deliberate indifference claim, law's failure to resuscitate Monroe did not rise to the level of deliberate indifference and therefore cannot be a violation of clearly established law. Your Honors, this court has held in the context of jail suicides that we do not demand perfection. But, Your Honors, perfection rather than the deliberate indifference standard is what the appellees are asking this court to hold. The jailers therefore ask that this court give them qualified immunity. Thank you. Thank you, Counsel. That will conclude the arguments for this morning. The court stands in recess until 9 a.m.